Okay, once you've got a chance to put your stuff down, we'll call up the next case, number 18-11177, Defrades v. Podany, I might get these names wrong, I'm sorry. May it please the court, my name is Randall Callinan and I represent appellant Cory Defrades. Your Honors, this case is about a supportive parent calmly asserting his rights and an off-duty cop who lost his temper, brutally attacked Mr. Defrades and left him permanently disabled, unable to work or care for his child. We respectfully ask that you reverse the district court dismissal of this case on the grounds that Appellee's use of force was objectively unreasonable for at least three reasons. Defrades posed no threat or an extremely low level of threat, Appellee Podany immediately resorted to extreme force with no attempt at verbal negotiations, which this circuit requires under its graduated elevation of use of force. And the court failed to balance Defrades' clearly established constitutional right with the state's interest in this matter. Okay, so what's your best case that's got similar facts? Because just the generic notion that you can't assert excessive force would be considered too general, I think, by the Supreme Court here. So point me to a case that's similar in facts that you say, um, Mr. . . . or Officer Podany violated. Well, there are a couple, Your Honor, um, one of which is Delaville v. Mercantile, which is a 2009, uh, Fifth Circuit case, which is in our brief at . . . and that's at 567 Fed 3rd, 156, uh, another case involving injury to the head, Tarver v. City of Edna, which is at 410 Fed 3rd, 745, specifically at 753, a 2005 case, um, the concept that takedowns reasonable is a 2009 Fifth Circuit case, Payne v. Dickerson, 333 Fed APX 629. And furthermore, that, uh, knee strikes, such as we're claiming in this case, are objectively a reasonable, uh, such as in, um, a 2009 case of Peterson v. City of Fort Worth at 588 Fed 3rd, 838, these are all in the briefs, by the way, Your Honors, and, uh, that force is unreasonable given that there was no negotiation, such as, I'm a police officer, you're under arrest, please stop resisting, I'm going to put you in handcuffs, um, those . . . The whole, and trying to get him to leave, and . . . The only command, uh, I guess we could call it a command that this particular, uh, off-duty officer gave to Mr. DeFratis was, walk this way with me, and that's it, okay, you're legally at your daughter's school, and somebody who's not, who's in plainclothes comes up to you and says, walk this way with me, what do you do? I mean, he never said, you're under arrest, he never said, you're trespassing, he never said, I think you're violating the law, you're dangerous, or anything else. Walk this . . . I agree that because y'all never challenged his plainclothes, if you will, status, his ability to be a police officer at that moment, that we have to deem him a police officer at that moment, and that's, when a police officer walks up to me and says, walk this way with me, I have a different reaction than when just some random guy comes up to me and says, walk this way with me. Well, well, well, your honors, um, I believe that, uh, under the circumstances, what our client, um, Mr. DeFratis says, is that he wasn't certain that this was a police officer because the only information that he actually had, uh, about that was his eight-year-old son used the word C.O.P., cop, but his son doesn't know the difference between the guards that are at the school in uniform or police, so he did not know, and he claims he did not know. He knew he had some authority. He wasn't just some random guy out of, off the street walking up there and telling him that he was either a security officer or a police officer. He was some kind of cop. Well, only in the sense that, uh, once, if someone were to come up to a person and say, walk this way, I don't actually, we're not going to, uh, concede that because I'm trying to imagine right now, I would like to try to imagine these things in my head. I'm at a, I'm at a, at a function where I'm legally there, my children are there, I'm not doing anything illegal, and somebody in plainclothes comes up to me and says, walk this way. Do you want to talk to me about, uh, something I was doing? Because my kid is referenced as a cop. That's a little different. I mean, what I'm saying is it's not just somebody off, off the street. Your client knew that the person had some sort of authority, be that security officer or police officer. DeFratis is going to respectfully disagree with that, Your Honor, um, that he, he knew that. Uh, he didn't, he did not know who this, uh, individual, you know, was. As it turns out, he was the husband of the, I guess the administrator who was there, which by the way, the interesting fact, which is in here, is that Elizabeth Podany, the wife of Mr., of the officer, uh, plainclothes officer, actually felt so unafraid of Mr. DeFratis, she took DeFratis by himself into a private room and then challenged him and criticized him. Is that what a, a lone woman does, uh, to a frightening person, uh, who they think is going to do something? Didn't he walk out and call her evil? What's that? Didn't he walk out and call her evil and say he wasn't leaving, even though he had a criminal trespass warning issued against him? That's what the, uh, opposing side said. We, we say that, that, uh, did not occur and let's say that it possibly did occur, um, he's there watching his children, uh, child, uh, he loves his child. He had already had his presentation, the presentation was over. It was a couple of repetitions of press, uh, presentation, presentations, the child has to give it, uh, several times apparently and the other parents there also were, were like watching the other, they, they would like want to see what the other children were doing, how they, that they were, you know, like being parents because of course if you're at a school event and you're a parent, children love to be encouraged and so if you're an adult, um, encouraging children. Is, um, is your client, Mr. DeFratis, in fact asserting on appeal that there is a question of facts whether your client knew that the officer was in fact an officer? Uh, yes. Yes, he's a, he's asserting that, like once again, the explanation is, it's in the brief, but it's the, the child, his child apparently said something about this guy is a cop, used the word cop, but DeFratis says he doesn't, his, his kid doesn't know whether that's security guard, an actual police officer, or... How does that question of fact inform or color our understanding of whether the officer is entitled to immunity or not? Well, it colors it in just a little, uh, a little manner because of course you're supposed to take the totality of the circumstances into, um, consideration, but what, it would be, uh, more unreasonable if someone did not know, if a officer, uh, did not, um, have a uniform on or some other, in some other way convey that he was, uh, an officer. He didn't, this guy didn't have a uniform on. He never said, I'm a police officer, which, uh, I find very, um, disturbing. If I'm a police officer and I want somebody to do something, I would merely say, I'm with the Houston Police Department, off duty, I show a badge or whatever, could you kindly come with me, please? He never did that. All he did say was, walk this way or walk this way with me. So looking at the totality of, uh, what DeFratis knew, uh, but you also, more importantly, um, DeFratis, if you look at the video, he's, uh, he's doing what most experts, and we had some, uh, testimony in here about, uh, he's doing only passive resistance. Passive resistance is allowed. You know, of course, uh, active resistance is when you're like, you go and push the officer or you punch the officer or do something like . . . He's very focused on getting himself water. Well . . . And that seems a little weird in this circumstance, when you're getting in a fight with a, quote, cop, to be that focused, I mean, I think hydration is important, but that seems a little hyper-focused on the water, and it could lead a police officer to kind of wonder what's happening here. Well, due respect, Your Honor, I could use some water right now, but, um, no, it isn't really, um . . . You're not going to fight a police officer for it. He . . . we . . . he wasn't fighting the police officer. He was using, um, um, passive resistance, and let's say he did . . . he was thirsty, and he was just, uh, apparently being told by someone to leave, and so he needed a drink of water. And so that's what he did. Uh, whether . . . I don't know why the officer just didn't say . . . It's a weird video because he . . . you know, he is kind of . . . he's trying to get to the water. He keeps trying to get to the water. The FIDANI keeps grabbing him. They get to the water fountain. He's clearly trying to get his arms so he can turn on the water fountain. Yes. Mm-hmm. And then there's a little, like, second, and then all of a sudden he's on the floor, and I'm just not really clear how we went from that, how we went from the water fountain to the floor, but there's not . . . I . . . I can't hear what's being said, so can you tell me what was being said at that moment? Our client says that he . . . the officer didn't . . . never, um, has never identified himself as an officer or what he was, you know, doing or saying, um, I'm going to arrest you or I'm an officer. He never says anything, uh, like that, and to elevate from, uh, that situation, getting the drink of water to the floor, we've cited some case law that . . . But what was said then? At that moment where he's trying to get to . . . he's at the water fountain, finally, and he's trying, I guess, to get himself a drink of water, the . . . the . . . then FIDANI takes him and throws him on the ground. What exactly happened at that moment? What . . . what was said? Well, that's two questions. Um, what happened and what was said, uh, I cannot tell you with absolute certainty, uh, what was said. Our client claims that he . . . he never said anything, uh, to excite the officer and so forth, but what I . . . what I do know, and you . . . you . . . excuse me, you know it as well, is that was an example of excessive force. Possibly, the officer, um, as a part of his anger said, no, you need to get out of here and you're disrespecting me, I throw you on the floor. That's probably what happened, because if you recall, um . . . I'm just making that up. You don't know what happened. Your Honor . . . your Honor, uh, just one second, um, uh, let me let . . . let me address that. Um, when this officer went up to, um, Mr. . . . Mr. DeFrati's beginner, the first . . . first second, before Padani takes him and throws him on the ground, what does DeFrati's say happen? He's merely trying to get some water, just like you said. What does he say, and what does Padani say? That's what I'm trying to get at, because I can see the video . . . Yeah. . . . and the video is very strange. I'm asking for what was said. I don't, um, uh, I don't know, but our client says that he didn't say, uh, he . . . he neither said anything or, uh, nothing at all that's, um, alarming or disrespectful. So, uh, I think that the, uh . . . I think that at that point, um, I think, uh, the jury, I believe the jury could determine that Mr. . . . Mr. Padani was continuing his anger, um, uh, as exemplified by when he used the F word, very unprofessional, to a man who's never been convicted of a crime in his life. He was a radiologist. He lost his radiologist job. His injuries were very severe, and now he is permanently disabled according to the Social Security Administration. Due to that . . . Is there medical evidence in the record of the head injury, yes or no? Uh, there is medical evidence in the, in the record, yes. What? There's medical record in the . . . uh, medical records in the evidence, and there's also his testimony about, uh, his injuries. I rebuttal that you give us a cite to the medical records. Yes. Uh, nothing . . . I have nothing further, Your Honors. Time for rebuttal. Okay, may it please the Court, Counsel, my name is Daryl Noga, I represent Officer Padani, and I'm excited to be before you today because I get to have an argument to have you reaffirm and reassert the rationale you held in Grigsby Brewer, which is directly opposite to this case. And, in all candor, were you to reverse the trial court, uh, you would have to do a serious departure from the reasoning and the holding in Griggs v. Brewer. Now, as a caveat, I will point out that Griggs v. Brewer, as, as you noted in the opinion, Judge Haynes, was, was not clearly established law at the time, and it came down in 2016, which was after this case. But if Officer Brewer did not have clearly established law, that his takedown maneuver was constitutionally unreasonable, certainly Officer Padani did not have it. Now, I would vigorously argue there was no constitutional violation, but the low-hanging fruit here is the same rationale you used in Griggs v. Brewer, which is the question for us was whether the officer's conduct was unreasonable in light of clearly established law and the circumstances. Um, it's important that the trial court consider the summary judgment evidence, including the information available to Officer Padani at the time, that his actions were not objective. Help me with that couple of seconds there at the water fountain that I've been focusing on. Yes. Because I have to say, I thought, well, let me just see this video. I had a totally blank mind watching the video. I didn't come in there for or against either side. Right. And I was just shocked. I wasn't expecting the throwdown to happen at that moment. So tell me why it did. I will, Judge. And I will give you some context for it, too. First of all, on the cop, if I can refer you to the record at 702, this is Plaintiff DeFredi's own affidavit. He says, he says, I made a comment similar to, I understand you are a cop. That's what he said in his own affidavit. He knew he was a cop. He said that. And from then on, Officer Padani reasonably knew that his commands and actions were being viewed in that context. You want to know what happened, I would refer you to the record at 385, because that's where Officer Padani responded to his superiors who reviewed his use of force. He was both cleared by his own superior and by Police Chief Rhoades, and he said, after he acknowledged I was an officer, he again said I would have to arrest him before he would leave. Now, keep in mind that he had also overheard and testified in the record in his deposition. He was by the doorway when DeFredi said to another administrator, who was his wife, but was talking to DeFredi, trying to get him to leave, and he said, I'm not going to leave. You're going to have to arrest me, and you're the evil in this world. So he hears that. He listens to him saying, you're not going to leave. He knows that the principle has come up. But does he say you are under arrest? He does in the video, but under the case law of the Fifth Circuit, the minute the officer starts to take control, that's called the effectuation of the arrest. That's I believe the case is Ramirez or Morales. Let me double-check that. But it is very clear, yes, it's the one that says that the effectuation of the arrest likely has state cases, Latham v. State and Bruno v. State, that says once the officer starts to put you under control, he begins the process. If he says you're under arrest, and in the video he does say you're under arrest at the end of it, it doesn't matter. Once he starts it, he's effectuating the arrest. Now... I get it until that point, and I get it after that point. But the throwdown to me comes out of nowhere. And so help me with that. I will. As this Court said, context is important. They had an active... I will venture that this Court has never had a case where a plaintiff had to have active shooter training requested specifically because of him. If you look at the record, 415, 421, he inspired active shooter training specifically because of prior incidents with him and his aggressive behavior. Officer Padani knew this. Padani was the one they called to do the safety training, the shooter training, and the principal told them it's because of DeFratis. They had had prior issues with him. So Padani knows this. He knows he's had issues with aggressive behavior. Is that why the other people don't seem afraid and still put anti-acts like that? Because what I'm concerned about is usually, like, even if I have a naturally loud voice, and sometimes I've noticed that, like, just when I'm talking normally, people look at me kind of funny because I just have a naturally loud voice. And yet no one in this hallway is really reacting much except Padani. I mean, people are still wandering around. There's kids here and there and milling about. And so there doesn't seem like whatever DeFratis is doing is this kind of frightening thing that makes everybody start running. So is it Padani? What you're saying that Padani's background knowledge is what made him more frightened than other people? Well, and the principal told him he's not leaving, and he said, I need you to help me make him leave. I told him to leave. The principal, and there goes his probable cause for criminal trespasses, Judge Clements said in that Gragg case, Skinner v. Gragg, which is unpublished opinion but still instructive, as long as he knows that the controller of the premises tells him to leave and he sees him there, you held that the officer is probable cause to arrest for criminal trespass. Now, what he was trying to do, and if you look at the video, watch how he's moving his body between the kids and DeFratis. And he's got his hand out, and he's gesturing him down the hall, and he says in his report on 385, I wanted to get Mr. DeFratis further down the hallway to protect the children and staff. I was thinking that if an altercation did occur, it would be away from the event area where there was a large crowd. It was unknown if he had a weapon on him because he had not been searched. I just didn't want to wait to take action as he was attempting to get back inside the event and in contact with children. After telling him we needed to walk further down the hallway, and he again telling me he's going to get a drink of water and go back inside the event, the comment about getting water did not seem genuine to me. I was concerned about what he was planning. At that point, I went hands-on to make the arrest because there was clearly probable cause for arrest and a threat to the children, safety, and staff. I don't mean to keep repeating myself, but he's at the water at that point, okay? So whether he's, whether Padani believed him or not, he's there at the water trying to get the water, and then suddenly he's on the ground. I'm just having trouble with that moment. There were kids by that water fountain in the video. Padani was moving between him and the water fountain, and the kids are passing behind him in the video. Padani was scared. The witness, you said, was not scared. She was crying in her deposition. If you look at the record, they had to stop the deposition. If she wasn't scared, why would she throw herself on the feet? They had a couple people trying to keep him down as he was struggling. They were, when you have an active shooter, somebody that inspires active shooter training, and he's in violation of a criminal trespass order, and he's on school property, and you know, unfortunately, the state of current events where we've had tragedies in school that are unavoidable. And you know that, and the facts of what the officer knew is what's dispositive. The whole analysis of qualified immunity is turned on its head by plaintiff where he throws in all these subjective things. It's not objective reasonableness. The trial court viewed it with objective reasonableness and went through the facts that Padani knew were reasonably believed. And they're supported by the evidence. And you have, what parent among you would say, well, I've got an active shooter, I've got a parent who inspired active shooter training, who was cited twice for being aggressive to the school, before Padani, the school had to hire security officers from Cedar Hall Police Department to take care of him. It's not that water fountain moment. It's the whole picture. Yes, it is the picture. And it's a succession of... Yes. Nuanced events, then leads to the final throwdown. I think that's fair, Judge. And I also think the fact of the matter is that at that point in time, Officer Padani knew he wasn't supposed to be there. The principal had told him to leave. He had heard him say, I'm not leaving, you'll have to arrest me. And he was worried about what he was going to do, and he was trying to protect the staff and the children. When did he try to get the wrist behind his back? Was it before the water fountain or at the water fountain? Judge, I'm sorry, when did he... The policeman was trying to get Padani's wrist behind him, his back, to secure his wrist, and then ultimately they threw him on the ground. It was... Yes, Judge. It was before. The water fountain? It was before. He starts guiding him down the hall. You show him pointing his hand, going down the hall. This is after he had said, I made a comment that I understand you are a cop, according to his own thing. So now he knows, in Padani's mind, I'm a cop. I'm telling him, move down the hall. He's criticized in his brief for not investigating. Padani said, I was trying to talk to him. I was trying to investigate further. Get him down the hall. Get him out of a confrontational area. The first time you see him, when he touches him, when he grabs him, he pushes himself up against the wall and spins, and it's kind of a bizarre focus on the water fountain, but first he pushes away from the wall, then he goes back to the water fountain, and you can see the officer grab him and hold him and take him down. Can you catalog for me, just sort of itemize it as best you can at the podium, the various record citations, really remove any doubt that Mr. DeFratis, in fact, knew that Officer Padani was Officer Padani and not merely a private security guard or something else? That would be 702. It would be paragraph 33 of DeFratis' affidavit, record site 702, and I believe in the deposition of, I don't have the record site, but we attached it to the appendix, the deposition excerpts we cited of Officer Padani stated the same thing. And then if you look at the record on 385, there's another page beside 702 where Plaintiff says it, 385, Officer Padani confirms it where he says, after he acknowledged that I was an officer in his report. So those are the two where he acknowledges he's a cop, one from DeFratis, one from Padani. Well, and it would be reasonable for Padani to think the term cop means a police officer, even if DeFratis used it as a different word. Correct, Judge Haynes. I agree with that. I don't know that everybody has to, I mean, a reasonable construction of the term cop is police officer, although apparently there's other meanings. But you're arguing that DeFratis knew the officer status throughout the entirety of this confrontation. It didn't just sort of dawn on him at some point during the confrontation. Absolutely. Absolutely. He stated it before the confrontation, according to both of them, according to his affidavit before it began. And as I said, if you look at the continuum of force used, there's no asp, baton, there's no taser, like some of the cases that were cited, and I can distinguish, the cases the plaintiff cites are distinguishable, but you've got a very similar factual pattern. You've got a takedown, even looking at Griggs v. Brewer, which you decided, there were multiple punches to the head there. Here he was punching the torso to gain control of his arms. You have to gain control of the arms. He didn't know if he was armed or not. He said that. So you said that was constitutional in Griggs v. Brewer, and you look at the qualified immunity analysis. Can you say that Officer Padani, with his heightened fear about this person's background and what he himself knew and what he was told by the principal, was plainly incompetent or knowingly violated the law? No. He said he didn't know whether he had a weapon. Didn't he have a jacket on, a blazer? That's correct, Judge. He didn't know. He testified, I didn't know what he had. He had a light jacket on over it or something, and he couldn't tell, and the fact of the matter is, I think that a jury, you know, whether a jury would find whether he was actually resisting or not or what the level of resistance was, I think the video is clear. I think it's a Scott v. Harris analysis. There's nothing hidden from this court. You can see the level of force used. I don't even see any strikes to the head. It looked like the knee strike was to the shoulder, and the officer testified that's what he was trying to do. What about the medical evidence that they say is in the record? The medical evidence is not in the record. I would challenge this court to go look for it because I couldn't find a single evidence in the record, and think of this, in the summary judgment below, the trial court didn't limit him. He could have filed medical records. He could have filed a medical affidavit. There's none of that in the record. But we're not to the point of whether he has substantial damages or not. We're just asking whether he can even get there. Well, I agree, and I think the reason the medical evidence comes in is only in terms of judging the amount of force used. I think where he's trying to go with that— We can see it in the video. Right. I think throwing somebody to the ground without any basis to do so would be excessive force, so the question gets back to, under the qualified immunity standard, was it objectively reasonable to use that degree of force, and was it clearly established law under these kinds of facts? That's really it. I think once he's thrown to the ground the way he was, that's enough, even if he hadn't lost his radiology job as a result, et cetera. No, I agree. I agree, but there's an issue with that in some of the cases where they talk about establishing causal link between a certain amount of force and a certain injury, and we just don't have that. And this Court has said before, in other cases, you need competent medical evidence to link that. Well, I think, you know, we have some case law that muddies the water on that question. The medical evidence can be evidence of the amount of force used. You don't have to have caused somebody to lose their radiology job to have used excessive force. Correct. If you throw someone on the ground like that on a tile floor or whatever that was, a concrete type floor, then that's enough, in my view, to be excessive force if you had no basis using the qualified immunity filter on that. Correct. Now, the other issue that I would point out is, again, the clearly established law one I submitted, I said that the trespass claim was clear, and I really think that that's beyond dispute. And if you have probable cause for one arrest, you can have probable cause for any offense, according to the case law. You've got a situation where Principal Johnson told him, in the record, at 416, he said, he told him, DeFrates is in violation of criminal trespass order. I heard Mr. Callan say repeatedly he was there legally. He wasn't. And then when the Principal did discover him and tried not to escalate it and said, basically, you can stay to watch your kid, and now you have to leave, he wouldn't do it. He told the Principal, I'm not. I'm not going to leave. You can't make me, basically. And he told another person, an administrator, you'd have to arrest me. And he knew that was the Principal? Yes. He's had, this is the- There's no confusion over who the Principal is? No. This is the Principal who sent him the letter putting him under the criminal trespass warning two other times. And keep in mind that Officer Padani had also read the reports. It's in the record on 1135 and 448.50. He had read the field reports and the police notes on these prior trespass warnings that actually talked about the fact that there were serious questions about troubling Facebook postings. He had been going through a divorce. He had been going through custody battles. He had been disruptive. The school had requested additional officers. That school had noted his aggressive behavior. So Johansson comes and tells him, I told him to leave. And he's not supposed to be here. Didn't he also tell him that he had called? I think that- That's why Padani didn't wait for that other officer. That basically goes to show that Padani really was scared. And everybody else was nervous about what was going to happen because Padani said, he said, I really didn't know when they were going to get there. He called a uniformed officer. He said they were five to ten minutes away in his normal estimation. But he was not sure when they would actually get there, obviously. And he said in his report that I cited to you on 385 of the record that he couldn't wait. That he was getting nervous about his actions and what he thought was bizarre behavior and the fact that all the children were around and he was disobeying his commands. He told him- Children in the hall. I'm sorry, Judge? Children in the hall. Yes. Look at the video. You're going to actually see. And that's- You said that earlier. It's kind of interesting because you wonder if somebody is so calm and peaceful as plaintiff was supposed to be, why are you getting in a confrontation? Why are you not just walking down the hall and voicing your reasonable concerns to somebody? He had exhibited aggressive behavior before at the school. That's why he had two criminal trespass warnings. That's why specifically designed to him, they requested safety training, active shooter training and he had been in the military. Padani knew that. Now, Padani also had information. His ex-wife said he was in special forces. According to his own affidavit, he was in infantry, but it didn't matter. Padani had that information available to him. It doesn't need to be historically accurate and he was in the military. So that also goes into the calculus. But when the principal tells him, I told him to leave and he's not leaving and he's not allowed to be here. You said that that gave a reasonable officer probable cause to arrest for criminal trespass. And that's clearly what we have here. Now, the excessive force, as I said, I don't think it's excessive. There was nothing but he started out with commands, verbal commands. They were not obeyed. Go down the hall with me. Let's talk. Not obeyed. No, no. Watch how he puts his hand on his back to stop him from moving away from him. Keep in mind that during the whole event, this person, DeFratis, is going where he wants to go. He's doing what he wants to do. He's not supposed to be there. He shows up. He claims he was. Well, it doesn't matter. He tells the principal, I'm not leaving. The principal says, stay here. Don't go wandering around. He's like, nope. I'm going to do whatever I want. Tells another administrator, you're evil. You're against me. You're going to have to arrest me. And then he does get arrested. And frankly, it's a scary character. There aren't many parents who specifically get that kind of treatment. There's something there. And Padani knew it. And he knew it. And those are the facts that the district court relied upon to say that he did not behave unreasonably. His conduct was not unreasonable. Now, I submitted the Escondido case in supplemental briefing. I apologize, but it came out from the Supreme Court right about the time we were filing our briefs. And I simply cited that for the Supreme Court warning again, as Judge Haynes said, that you cannot define clearly established law. A high level of generality. Right. You got it. I see my point. But that doesn't mean that you have to have the exact to the second facts. True. So that's the range is somewhere between the exact down to the second facts and a high level of generality. That's correct. I see my time's up, Judge. Thank you. All right. So we'll hear from Mr. Padani now on rebuttal. If you would begin with the record sites for the medical records that I had asked you to get. Yes. Record on Appeal 704, where... Okay, that's his affidavit. That's not a... Right. Well, he knows if he's injured or not, Your Honor. So I do not know if there's any medical records. Once again, the amount of injuries that he received, he testifies that he has a traumatic brain injury. And who would know better than that? So you don't know if there's actually something with a doctor's signature or a nurse's signature in the record? Is that what you're saying? I'm not certain in the record. I'm not saying it has to be. I'm just asking, because it comes to the discussion we had earlier, and I just wanted to... Usually, I'm the trial attorney, and this one I wasn't, and it was so... I'm not as familiar as I usually am. However... Was it an allegation he was suffering from PTSD, or is that... I think I have another case. No, I think he does suffer from PTSD, but so do lots of people, and that's never been a... People who are mentally ill, you cannot tackle them. But I wanted to get right to one of the various big points that was talked about a lot. And that is on the record on Appeal 792 to 793, where Podany testifies under oath that Defrades was neither physically or verbally aggressive or demonstrative. He made no sudden gestures nor threats to the breach of the peace, nor did he inappropriately engage students, parents, teachers, staff, or anyone else. The... Appellee relies on his own testimony, which are issues of fact, where here, Podany is making his own admission. Furthermore, Mr. Podany was never stopped... Excuse me, Mr. Defrades was never stopped from being at these extracurricular events such as this one. You said 792, because that looks to be an affidavit of your expert, or something like that. It's an affidavit. Oh, it's an affidavit of the expert? Okay. I have it down here as something... It appears to be an expert, because he's talking about his degrees and... Right. It could be a typo, but we have in the record his own declaration, I believe, in this case. Mr. Defrades... So we'll look for it. We'll look for Defrades' declaration. Thank you, Your Honor. But regarding the trespassing, he was not trespassing. As a matter of fact, that case against him was dismissed. Furthermore, he was not resisting, because that case against him was dismissed. So, these crimes they charged him with, trespassing, dismissed, resisting, dismissed. You see, there was something... But also, dismissing a case doesn't necessarily mean there was... Yes, Your Honor. I understand, but it certainly is kind of indicative of it, if he's this big threat. Apparently, he's an active shooter at a school, and they dismissed the case against him. Columbine... He was an active shooter that day. They're saying that they feared he could be an active shooter. And having just had two active shootings this past weekend, I think people can appreciate you'd like to prevent them, rather than simply address them afterwards. I understand that. Anybody with weird behavior apparently can be an active shooter. All these shootings that we just have seen in the news and so forth, people, regular appearing people, just start shooting people. And so that means that anybody in the public can be an active shooter. By the way, these issues about the training, Columbine was in 1999, Newtown, the Sandy Hook was in 2008, and now they say, oh, we had no training at all with these mass murderers at schools, but when Podany has some Facebook posts, then we do the training. Well, if they did not do the training before that, that certainly is not due to them. That seems like their own negligence. Unqualified immunity. Right. And so what the appellees... You have 44 seconds left to sum up for us your best argument why we should reverse unqualified immunity. There was no... He was never told that he was arrested. Nothing happened. Our client said nothing at the fountain. He threw him on the ground. And it's long been known that injury to the head is very, very serious. He kneed him right in the head. And they say, of course, he didn't. He kneed him in the shoulder. But even if you look at the case law, you shouldn't even knee people in the shoulder. So what we have here is the classic fact issue. They say one thing, we say another. This is the classic case of the argument under Tolan v. Cotton, attributing all the facts to the defendant when it should be attributed to the plaintiff. Okay. Thank you, counsel. We appreciate both sides' arguments.  And this concludes the hearing.